John K. NELSON, Respondent
(C0–89–687),

Naaman Holloman, Respondent
(C2–89–688),

Sheldon W. Erickson,
Respondent (C4–89–689),

v.

STAR TRIBUNE, A DIVISION OF
COWLES MEDIA CO., Relator,

Commissioner of Jobs and
Training, Respondent.

Nos. C0–89–687, C2–89–688
and C4–89–689.

Court of Appeals of Minnesota.

Sept. 26, 1989.

Daniel C. Gerhan, Donald Peder Johnsen, Faegre & Benson, Minneapolis, and John Dennison, Gen. Counsel, Star Tribune, a Div. of Cowles Media Co., Minneapolis, for relator.

Richard A. Williams Jr., Hvass Weisman & King, Minneapolis, for John K. Nelson, respondent C0-89-687.

Richard A. Williams Jr., Minneapolis, for Naaman Holloman, respondent C2-89-688.

Richard A. William Jr., Minneapolis, for Sheldon W. Erickson, respondent C4-89-689.

Hubert H. Humphrey, III, Minnesota Atty. Gen., Laura E. Mattson, Sp. Asst. Atty. Gen., St. Paul, for Com'r of Jobs and Training.

Heard, considered and decided by PARKER, P.J., and KALITOWSKI and IRVINE *, JJ.

## OPINION

L.J. IRVINE, Acting Judge.

The Commissioner of Jobs and Training determined that respondents, former employees of relator Star Tribune, were not discharged for misconduct and were entitled to receive unemployment compensation benefits. We affirm.

## FACTS

Respondents Holloman, Erickson, and Nelson were employed as mailers by relator Star Tribune. All three respondents were relatively long-term employees of the Star Tribune and were members of the Minneapolis–St. Paul Mailer's Union No. 4. The union steward was called "chapel chairman."

On Saturday, August 13, 1988, a regular shift was scheduled to work from 6:30 a.m. to 2:00 p.m. All of the respondents were working a separate overtime shift scheduled for 9:00 a.m. to 4:30 p.m. Respondents Holloman and Erickson were also scheduled to work another overtime shift from 7:00 p.m. to 2:30 a.m.

At approximately 11:00 a.m., the Star Tribune's foreman indicated to the chapel chairman that additional overtime would be necessary that day. The foreman wanted to divide the additional overtime between the 6:30 to 2:00 shift and the 9:00 to 4:30 overtime shift. The chapel chairman disagreed, indicating that he would rather have the 6:30 to 2:00 shift work all additional overtime. The chapel chairman asserted that he, not the foreman, had the right to make overtime assignments. According to past practice, when overtime was necessary, the foreman would notify the chapel chairman how many overtime workers would be needed and the chapel chairman would select the workers from a hiring list. However, a disagreement over the authori-

ty to assign overtime had been brewing since earlier that summer.

Since there was no dispute about the 6:30 to 2:00 shift working overtime, that shift continued to work past 2:00 p.m. At approximately 3:00 p.m., the foreman sent some workers from that shift home. However, it was clear that additional overtime would be required past 4:30. The foreman indicated that approximately 15 to 17 workers would be necessary to work this additional overtime.

Shortly before 4:30, the chapel chairman selected 17 workers to work past 4:30. The chapel chairman called out the names of these workers. All of the 17 workers on the chapel chairman's list were members of the 6:30 to 2:00 shift; therefore, respondents were not included on the list.

The foreman and chapel chairman continued to disagree about who would work the additional overtime. The chapel chairman became upset, handed the foreman the hiring sheet and told him to select the overtime workers himself. Shortly thereafter, however, the chapel chairman took the sheet back. At that time, the foreman had not selected 17 other workers for the overtime.

The foreman decided to "freeze the floor;" i.e., order all employees to remain on duty. In the past, only the chapel chairman had ever frozen the floor. The chapel chairman announced that he would not order employees either to stay or leave at the end of their shift.

Two assistant foremen, stationed at each door of the mail room, were ordered to inform the workers not to leave the premises. Although the three respondents knew the floor was frozen, they walked off the job at 4:30 when their shifts ended.[1]

The terms of the collective bargaining agreement effective on August 13, 1988, provided, in relevant part:

The Publisher shall be the sole judge as to the number of employees to be employed in its Mailing Room.

\*    \*    \*    \*    \*    \*

---

\* Acting as judge of the court of appeals by appointment pursuant to Minn. Const. art. VI, § 2.

1. Later, a few other employees asked to be excused and were allowed to leave the premises.

The Publisher agrees to respect and observe all regulations governing the posting and cancellation of overtime as have been adopted by the Union and as are in effect on the date of execution of this Agreement to be applicable to all employees covered by this Agreement. Any differences of opinion that might arise between the parties over the application and enforcement of such provision shall be subject to the grievance procedures provided for elsewhere in this Agreement.

After they left the Star Tribune premises on August 13, respondents were informed that they were discharged from employment.[2] They applied for unemployment compensation, and a claims adjudicator with the Department of Jobs and Training ("Department") granted their claims for benefits.

The Star Tribune appealed to a Department referee, who conducted a hearing. The evidence indicated that the three respondents knew the floor was frozen by Star Tribune management at the time they left, but also knew they were not on the chapel chairman's list of 17 workers. Respondents were aware of past practice, and knew the chapel chairman did not agree with the foreman's action.

Following the hearing, the referee determined that respondents committed misconduct by leaving when their shift ended, in violation of the foreman's freeze order. Respondents appealed to a Commissioner's representative who reversed, concluding respondents' actions did not constitute misconduct. The Star Tribune has sought review of the Commissioner's decision, claiming respondents committed misconduct by violating a direct order and failing to pursue established grievance procedures.

## ISSUE

Did respondents commit misconduct when they left the Star Tribune premises in violation of the foreman's freeze order?

---

**2.** Following grievance proceedings, respondents were subsequently reinstated on September 29, 1988. If not otherwise disqualified, they remain

## ANALYSIS

Minn.Stat. § 268.09, subd. 1(b) (1988) provides that an individual is disqualified from receiving unemployment compensation benefits if he is discharged for misconduct. In *Tilseth v. Midwest Lumber Co.*, 295 Minn. 372, 204 N.W.2d 644 (1973), the Minnesota Supreme Court defined "misconduct" as follows:

> * * * [T]he intended meaning of the term "misconduct" * * * is limited to conduct evincing such wilful or wanton disregard of an employer's interests as is found in deliberate violations or disregard of standards of behavior which the employer has the right to expect of his employee, or in carelessness or negligence of such degree or recurrence as to manifest equal culpability, wrongful intent or evil design, or to show an intentional and substantial disregard of the employer's interests or of the employee's duties and obligations to his employer. On the other hand * * * good-faith errors in judgment or discretion are not to be deemed "misconduct" * * *.

*Id.* at 374–75, 204 N.W.2d at 646.

The unemployment compensation laws are humanitarian and remedial in nature, and must therefore be liberally construed in favor of awarding benefits. *McGowan v. Executive Express Transportation Enterprises, Inc.*, 420 N.W.2d 592, 595 (Minn.1988). Consequently, disqualification provisions are construed narrowly. *Id.* An employee is presumed eligible to receive benefits, and the employer has the burden of proving the employee has engaged in misconduct and is disqualified from receiving benefits. *Id.*

The determination whether an employee has committed misconduct is a mixed question of fact and law. *Colburn v. Pine Portage Madden Brothers, Inc.*, 346 N.W.2d 159, 161 (Minn.1984). The Commissioner's factual findings must be

---

entitled to receive unemployment benefits for the period of their unemployment.

reviewed in the light most favorable to the decision, and may not be disturbed if there is evidence reasonably tending to support them. *White v. Metropolitan Medical Center,* 332 N.W.2d 25, 26 (Minn.1983). The question whether those facts support a determination of misconduct, however, is a conclusion of law upon which this court remains "free to exercise its independent judgment." *McGowan,* 420 N.W.2d at 594 (quoting from *Smith v. Employers' Overload Co.,* 314 N.W.2d 220, 221 (Minn.1981)).

■ The question whether an employee has committed misconduct differs from the question whether the employer was justified in discharging him. *Windsperger v. Broadway Liquor Outlet,* 346 N.W.2d 142 (Minn.1984) ("the issue * * * is not whether Windsperger should have been terminated, but whether, now that she is unemployed, she should be denied unemployment compensation benefits as well." *Id.* at 143.) Accordingly, even if respondents should have remained on the job and filed a grievance later, the question is not whether the Star Tribune was justified in terminating them; rather, the issue is whether respondents' actions constituted "misconduct" for unemployment compensation purposes.

In general, an employee's refusal to work a scheduled shift or comply with a direct order to work has been considered misconduct. *See e.g., Del Dee Foods, Inc. v. Miller,* 390 N.W.2d 415 (Minn.Ct.App. 1986) (employee committed misconduct by failing to work volunteered overtime); *Poepke v. Downtown Standard,* 356 N.W.2d 812 (Minn.Ct.App.1984) (employee who refused to work a shift committed misconduct); *Colburn,* 346 N.W.2d 159 (employee who deliberately left work before she was authorized committed misconduct).

■ When an employer's request is unreasonable under the circumstances, however, an employee's refusal to comply does not constitute misconduct. In *Sandstrom v. Douglas Machine Corp.,* 372 N.W.2d 89

(Minn.1985), the court phrased this rule in the negative:

> The general rule is that if the request of the employer is reasonable and does not impose an unreasonable burden on the employee, a refusal will constitute misconduct.

> \* \* \* \* \* \*

> What is "reasonable" will vary according to the circumstances of each case.

*Id.* at 91 (citing *inter alia, Hollar v. Richard Manufacturing Co.,* 346 N.W.2d 692, 694 (Minn.Ct.App.1984) ("The amount of overtime requested by the employer in this case was minimal, and was not an unreasonable demand upon the employee so as to justify her refusal.")).

In *McGowan,* the supreme court recently concluded that under the circumstances of the case, an employee engaged in misconduct when she refused to pick up a prescription for her employer. The court noted:

> The request by the employer was entirely reasonable. One in charge of a business must be allowed to expect that reasonable orders will be followed.

*McGowan,* 420 N.W.2d at 596.

■ The Commissioner's representative did not make a specific finding that the foreman's decision to freeze the floor was unreasonable under the circumstances; however, the Commissioner's representative noted:

> The evidence shows that it had long been the practice that the foreman would tell the chapel chairman * * * of the number of workers who would be needed to continue past the end of the shift in order to complete the press run, and that the chapel chairman would then determine the specific workers.

The record supports the Commissioner's finding that the foreman's decision was a deviation from past practice. Consequently, we conclude as a matter of law that the foreman's order freezing the floor was unreasonable under the circumstances.

## DECISION

Respondents did not commit misconduct when they violated an order that was not reasonable under the specific circumstances of this case.

Affirmed.